19 P.3d 1068 (2001)
Charles A. SEYBOLD and Andrea L. Seybold, individually and as husband and wife, Appellants,
v.
Bruce NEU, M.D., d/b/a Bruce Neu, M.D., Inc., P.S., and as Plastic Surgery Northwest; and Daniel L. Flugstad, M.D., Respondents.
No. 45505-2-I.
Court of Appeals of Washington, Division 1.
February 20, 2001.
Publication Ordered March 23, 2001.
*1070 Christopher Lee Otorowski, Carol Nofziger Johnston, Albert Morrow, Morrow & Myers, Bainbridge Island, for Appellants.
Timothy David Blue, Mary H. Spillane, William, Kastner & Gibbs, Seattle, for Respondents.
*1069 KENNEDY, J.
To decide this appeal we must determine whether a reconstructive (plastic) surgeon practicing at the Scripps Clinic in California is competent to testify that (1) an orthopedic surgeon specializing in musculoskeletal oncology in Seattle over-treated a soft tissue malignancy that had not invaded bone by removing approximately a third of the circumference of Charles Seybold's right lower tibia bone during the surgical removal of the tumor; (2) the standard of care applicable to orthopedic surgeons specializing in musculoskeletal oncology and treating soft-tissue malignancies in Seattle in June of 1992 required knowledge of the existence of and consultation with experts in a technique of progressive pathologic examination of tissue before its removal to determine whether tumor invasion had occurredto the end that healthy tissue would not be removed unnecessarily; (3) the unnecessary removal of healthy bone resulted in a greater than 51% probability that Mr. Seybold would ultimately suffer a pathological fracture of the weakened, weight-bearing tibia; (4) the use of cadaver bone as opposed to live bone from Mr. Seybold's own body to graft the excised bone tissue, followed by radiation treatment, greatly increased the chances that Mr. Seybold would suffer a pathologic fracture of his lower right tibia, which he ultimately did; and (5) but for the inappropriate treatment, Mr. Seybold more likely than not would never have been placed in the position, four years later, of deciding on amputation of his right leg below the knee. Because the record reflects that both orthopedic surgeons and plastic surgeons routinely treat cutaneous malignancies growing next to bone that have not invaded bone, the relevant specialty here is not orthopedic oncology; it is the surgical treatment of cutaneous malignancies. Thus, the trial court erred in striking the deposition of the California plastic surgeon on the basis of incompetency in the relevant medical specialty, and in dismissing the Seybolds' complaint on summary judgment for lack of expert testimony to support the claims. We reverse and remand for trial or such other proceedings as shall be consistent with this opinion.

*1071 FACTS[1]
In April 1992, Charles Seybold went to Dr. Bruce Neu, a plastic surgeon, for an examination of a lump on his lower right tibia, commonly known as the shinbone. Dr. Neu performed an excisional biopsy of the lump and pathology reports subsequently revealed that it was a malignant soft tissue sarcoma, specifically a myxoid malignant fibrous histiocytoma, located on the distal third of the tibia. This is a rare and life-threatening condition. Dr. Neu referred Mr. Seybold to Dr. Daniel Flugstad, an orthopedic surgeon specializing in musculoskeletal oncology. Dr. Flugstad practices in Seattle.
Dr. Flugstad evaluated Mr. Seybold by physical examination and magnetic resonance imaging (MRI). The MRI showed no margin between the tumor and the periosteum, which is the thin layer of tissue that covers the tibia bone. Dr. Flugstad recommended limb-sparing surgery followed by radiation therapy. He concluded that a wide local excision of the tumor, including resection of a portion of the tibia as a deep margin, and a wide excision of the skin, was needed to eradicate the tumor. This was to be followed by an allographic transplant to repair the resulting bone loss and a skin flap to repair the resulting skin loss.[2]
Dr. Flugstad subsequently testified in a deposition that he discussed various risks associated with the surgery with Mr. Seybold, including the risk of local recurrence of the tumor, the risk of neurovascular injury, the risk of pathologic fracture of the tibia, the risk of non-union of the bone in the event of fracture, and the risk of eventual below-knee amputation of the right leg. But he did not discuss these risks in terms of probabilities or percentages because Mr. Seybold did not ask him those questions. Dr. Flugstad further testified that if Mr. Seybold had "cornered" him he would have stated that the risk of either a pathological fracture or a non-union of the bone was "somewhere less than 50 percent, but I can't narrow myself down anymore than that." Clerk's Papers at 46. If he had been asked about the risk of eventual amputation, Dr. Flugstad testified that he would have responded that the risk was about 10%. There was no discussion of the risks of taking bone versus not taking bone when the cancer is cutaneous only, and no discussion of any alternatives to taking bone to ensure eradication of the tumor.
The surgery proceeded as planned on June 17, 1992. Dr. Flugstad cut out about a third of the circumference of Mr. Seybold's lower right tibia, creating a deep, bony margin. Fresh frozen cadaver bone was fashioned to fit the area from which bone had been removed, and then was screwed into place. A compression plate was also bent and twisted into an appropriate shape and screwed into place. A plastic surgeon then took over and performed the skin grafting to cover the wound. Radiation treatment followed.
Two years later, Mr. Seybold suffered a pathological fracture of his right tibia, which subsequently led to a painful non-union that failed to heal. In June 1996, after considering limb-sparing options that would take considerable time to heal and were not guaranteed to produce a functional leg, Mr. Seybold elected to undergo a below-knee amputation. Dr. Flugstad performed the amputation on June 26, 1996. Mr. Seybold was then 34 years of age.
The Seybolds subsequently brought this lawsuit, alleging medical negligence and failure to obtain informed consent to the initial treatment, proximately causing the amputation of Mr. Seybold's lower right leg and physical, economic and marital consortium damages. In August 1999, Dr. Flugstad moved for summary judgment dismissing the Seybolds' claims on the basis that they lacked the requisite testimony of a qualified medical expert to support the claims.
The Seybolds responded to the motion by presenting the deposition testimony of Dr. Gerald L. Schneider, a reconstructive (plastic) surgeon from the Scripps Clinic at La Jolla, California. Dr. Schneider testified that *1072 as a board certified plastic surgeon he is an expert in the surgical removal of cutaneous malignancies such as that which Mr. Seybold had. He was recruited by the Scripps Clinic to do cutaneous cancer reconstruction, although he also performs cosmetic surgeries for aesthetic reasons. His previous experience includes a large amount of trauma surgery, with respect to which missing bones or bones that do not heal are frequently referred to plastic surgeons for repair. Accordingly, Dr. Schneider testified that he is also an expert in bone grafting. Although he is not an expert in orthopedic surgery as compared to reconstructive surgery, he has assisted orthopedic surgeons during surgery, has been trained in bone fixation, and could fill in for an orthopedic surgeon for that purpose, if no orthopedic surgeon were available. He has testified in court as an expert witness in a case involving lower limb reconstruction in which the patient died. He has presented lectures to other physicians on various subjects, including cutaneous malignancies, and has twice published written materials on reconstructive surgery, including one article written in conjunction with an expert on Mohs surgery, a technique that Dr. Schneider opined should have been utilized in Mr. Seybold's case.
Dr. Schneider testified that the Mohs technique was developed specifically for the removal of cutaneous malignancies such as the one Mr. Seybold had, by Dr. Fred Mohs from Wisconsin. Although he is not trained in the Mohs technique, Dr. Schneider has worked closely with a colleague at the Scripps Clinic, Dr. Hugh Greenway, who is trained in that technique and Dr. Schneider consulted with Dr. Greenway during his evaluation of Mr. Seybold's case. A surgeon applying the Mohs technique works closely with a pathologist in mapping the area of the malignancy. Progressive amounts of tissue are removed and examined by the pathologist overnight, so that excision of a tumor of this type can take two, three, four, five or even eight daysthe goal being to remove all the malignancy but not to remove healthy tissue. The technique does not increase the risk of spread of the cancer and although there are inherent risks in repeated surgeries, these are manageable and a better alternative than removing healthy tissue. The excisions are done on an outpatient basis and the patient goes home overnight, returning the next day, and on as many successive days as necessary, until the pathology reports show that the malignancy has been entirely removed. Then, reconstructive surgery is commenced. Thus, if the Mohs technique had been utilized in this case, no bone would have been removed from Mr. Seybold's tibia unless and until it was shown that the periosteumthe thin layer of tissue that covers the cortical bonehad been invaded by the cancer, and that there was a probability that bone was involved. In Mr. Seybold's case, it is undisputed that the periosteum had not been invaded; neither had the bone. Therefore, if the Mohs technique had been utilized healthy bone would never have been removed. Dr. Schneider testified that he was not an expert in the submicroscopic involvement of cancer and bone, and explained that this is why surgeons employing the Mohs technique work closely with pathologists during the excision process.
Dr. Schneider compared the Mohs technique of treating cutaneous malignancies versus Dr. Flugstad's technique of taking a deep margin of healthy bone as a safety measure, with the advances made in the surgical treatment of breast cancer:
[T]he trend in all of surgery is to take less and less and less tissue. Breast cancer, with which I am reasonably familiar because I do a lot of breast reconstruction and because I was trained as a general surgeon to treat breast cancer, is treated entirely different today than it was 40 years ago.
The original Halsted radical mastectomy, a terrible deforming, humiliating treatment, is not even performed today because the understanding of the tumortumors in question has allowed a much smaller amount of tissue to be removed. And that comes about because of the understanding of how the disease spreads and other similar factors.
So this idea that you have to take a certain margin to cure the patient is based upon inadequate knowledge of that individual tumor. And the benefit of the fresh *1073 tissue technique is that you can tell when you remove all the tumor with highly reasonable certainty, better than 99 percent of the cases.
Clerk's Papers 117 at 42-43. Dr. Schneider also testified that the kind of tumor Mr. Seybold had rarely spreads to bone, and while the Mohs technique was not designed for musculoskeletal surgical procedures, Mr. Seybold did not have a musculoskeletal malignancyhe had a cutaneous malignancy.
Dr. Schneider testified that in his opinion an orthopedic surgeon holding himself out as competent to surgically remove cutaneous malignant tumors in Seattle in 1992 should have been aware that the Mohs technique was the method of choice for removal of cutaneous malignancies and should have consulted with a physician proficient in the technique if not himself so trained. The removal of healthy bone tissue was, in Dr. Schneider's opinion, a proximate cause of the ensuing pathologic fracture, nonunion and amputation.
Dr. Schneider also testified that living bone is always a better choice than cadaver bone for tibial bone transplants and that the expertise with respect to autographic bone grafting should have been available to Dr. Flugstad, as it had been in common use since the early 1980s. Once the decision to remove bone was made, living bone would have been a better choice than cadaver bone because of the increased probability of healing and because a living bone graft likely would have withstood the radiation treatments that followed better than a cadaver bone graft.
If living bone had been used, the pathologic fracture that subsequently occurred would have been far less likely, so that the pathologic fracture that subsequently occurred was proximately caused by the removal of healthy bone in combination with the use of cadaver bone, rather than live bone, for the bone grafting. In terms of probabilities, Dr. Schneider testified that in his opinion grafting with live bone rather than cadaver bone would have increased the chances of healing to better than 95%which in turn would have improved the chances of Mr. Seybold keeping his leg to better than 51%assuming that any bone had needed to be removed in the first place.
Dr. Flugstad brought a motion for summary judgment dismissing the Seybolds' claims on the grounds that they lacked the requisite testimony of a qualified expert to support their medical negligence and informed consent claims. Dr. Flugstad supported his motion with his own declaration asserting that he is one of a fairly small number of orthopedic surgeons in the United States who specialize in treating cancer of the musculoskeletal system, and that his care and treatment of Mr. Seybold was reasonably prudent in every respect and complied with the standard of care applicable to physicians of his specialty in the State of Washington in 1992. Dr. Flugstad argued that Dr. Schneider lacked the requisite expertise in orthopedics or orthopedic oncology to address the issues involved in Dr. Flugstad's treatment of Mr. Seybold.
The trial court granted Dr. Flugstad's motion on October 1, 1999. This appeal followed.

DISCUSSION
Summary Judgment
Appellate courts review summary judgment orders de novo, engaging in the same inquiry as the trial court. Gunnier v. Yakima Heart Ctr., Inc., 134 Wash.2d 854, 858, 953 P.2d 1162 (1998). Summary judgment in favor of the defendant is proper if the plaintiff fails to make a prima facie case concerning an essential element of his or her claim. Young v. Key Pharmaceuticals, Inc., 112 Wash.2d 216, 225, 770 P.2d 182 (1989). A defendant moving for summary judgment on the issue of negligence has the initial burden to show the absence of an issue of material fact, or that the plaintiff lacks competent evidence to support an essential element of her case. Fisher v. Aldi Tire, Inc., 78 Wash.App. 902, 906, 902 P.2d 166 (1995). If the defendant meets his burden by showing that the plaintiff lacks evidence to support his case, the burden shifts to the plaintiff to produce evidence sufficient to support a reasonable inference that the defendant was negligent. Van Hook v. Anderson, 64 Wash.App. *1074 353, 824 P.2d 509 (1992); Young, 112 Wash.2d at 225, 770 P.2d 182. In his responsive showing, the plaintiff may not rely upon the allegations in his pleadings. He must respond with affidavits or other documents allowed by Civil Rule 56(e), setting forth specific facts to show that there is a genuine issue for trial. CR 56(e); Id. at 225-26, 770 P.2d 182. The evidence and inferences from the evidence are viewed in the light most favorable to the plaintiff. Van Hook, 64 Wash.App. at 358, 824 P.2d 509.
Expert testimony is required when an essential element in the case is best established by an opinion that is beyond the expertise of a layperson. Harris v. Robert C. Groth, M.D., Inc., 99 Wash.2d 438, 449, 663 P.2d 113 (1983). Accordingly, expert testimony is required to establish the standard of care and most aspects of causation in a medical negligence action. Young, 112 Wash.2d at 228, 770 P.2d 182. Therefore, to defeat summary judgment in almost all medical negligence cases, the plaintiffs must produce competent medical expert testimony establishing that the injury was proximately caused by a failure to comply with the applicable standard of care. RCW 7.70.040; McKee v. American Home Prods. Corp., 113 Wash.2d 701, 706-07, 782 P.2d 1045 (1989). The standard of care is established by showing that "[t]he health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances[.]" RCW 7.70.040(1). Moreover, to defeat a motion for summary judgment, the expert testimony must be based on facts in the case, not speculation or conjecture. Melville v. State, 115 Wash.2d 34, 41, 793 P.2d 952 (1990), (quoting Theonnes v. Hazen, 37 Wash.App. 644, 648, 681 P.2d 1284 (1984)).
We first determine whether Dr. Flugstad's motion for summary judgment was sufficient to shift the burden of proof to the Seybolds. A defendant can move for summary judgment in one of two ways. First, the defendant can set out his version of the facts and allege that there is no genuine issue as to the facts as set out. Hash v. Children's Orthopedic Hosp. & Med. Ctr., 110 Wash.2d 912, 916, 757 P.2d 507 (1988). Alternatively, a party moving for summary judgment can meet its burden by pointing out to the trial court that the nonmoving party lacks sufficient evidence to support its case. Young, 112 Wash.2d at 225 n. 1, 770 P.2d 182 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)).
In this latter situation, the moving party is not required to support its summary judgment motion with affidavits. Young, 112 Wash.2d at 226, 770 P.2d 182. However, the moving party must identify those portions of the record, together with the affidavits, if any, which he or she believes demonstrate the absence of a genuine issue of material fact. White v. Kent Med. Ctr., Inc., 61 Wash.App. 163, 170, 810 P.2d 4 (1991) (citing Celotex, 477 U.S. at 323, 106 S.Ct. 2548; Baldwin v. Sisters of Providence, 112 Wash.2d 127, 132, 769 P.2d 298 (1989)). If a defendant chooses the latter alternative, the requirement of setting forth specific facts does not apply. The reason for this result is that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323, 106 S.Ct. 2548.
Expert Competency
Under the second method of moving for summary judgment provided by Young, Dr. Flugstad argued to the trial court that the Seybolds lacked competent evidence to support essential elements of their negligence claim. Young, 112 Wash.2d at 225 and n. 1, 770 P.2d 182. This challenge was sufficient to shift the burden to the Seybolds.
Ordinarily, "`[t]he qualifications of an expert are to be judged by the trial court, and its determination will not be set aside in the absence of a showing of abuse of discretion.'" McKee, 113 Wash.2d at 706, 782 P.2d 1045 (citing Bernal v. American Honda Motor Co., Inc., 87 Wash.2d 406, 413, 553 P.2d 107 (1976), (quoting Nordstrom v. White Metal Rolling & Stamping Corp., 75 Wash.2d 629, 642, 453 P.2d 619 (1969))). But *1075 we review the trial court's evidentiary rulings made for summary judgments de novo. See Folsom v. Burger King, 135 Wash.2d 658, 663, 958 P.2d 301 (1998) ("The de novo standard of review is used by an appellate court when reviewing all trial court rulings made in conjunction with a summary judgment motion.").
Dr. Flugstad argues that Dr. Schneider cannot qualify as an expert witness in this case because he is not an orthopedic surgeon, he is not an expert in orthopedic oncology, and, indeed, is not even an oncologist, he has never treated a malignant sarcoma located on the distal one-third of the tibia, he is not board certified in anything but plastic surgery, he deals primarily with reconstructive work rather than removal workindeed prefers not to remove cancers himself but would rather do reconstructive workhe is not an expert on submicroscopic involvement of cancer and bone, and he is not trained in the Mohs technique himself, in any event, and thus is not qualified to testify that it should have been used for the removal of Mr. Seybold's cutaneous malignancy. In sum, Dr. Flugstad argues that Dr. Schneider is not his professional equal and is, therefore, not qualified to opine as to the standard of care applicable to Dr. Flugstad's treatment of Mr. Seybold. Dr. Flugstad points to our Supreme Court's statement in Young for support of this proposition: "In fact, not even a medical degree bestows the right to testify on the technical standard of care; a physician must demonstrate that he or she has sufficient expertise in the relevant specialty." Young, 112 Wash.2d at 229, 770 P.2d 182. See also McKee wherein the Supreme Court said: "We recently reiterated the rule that to establish the standard of care required of professional practitioners, that standard must be established by the testimony of experts who practice in the same field." McKee, 113 Wash.2d at 706-07, 782 P.2d 1045 (citing Young, 112 Wash.2d at 216, 770 P.2d 182 et seq.).
Accordingly, we must examine the record to determine the "relevant specialty" and whether Drs. Flugstad and Schneider practice in the "same field." Having done so, we observe that it is undisputed that Mr. Seybold did not have bone cancer, and he did not have musculoskeletal cancer. He had a cutaneous malignancya skin cancerthat was located in a subcutaneous areaunder the skin. Dr. Flugstad himself testified at his deposition:
This is a subcutaneous lesion just by the definition of where it was. It can't be deep because there is no deep area where this was taken out. It's on the subcutaneous border of the tibia, which has skin, subcutaneous tissue, periosteum[,] bone. There is not muscle below that area, so by definition there is no deep area here.
Deposition of Dr. Flugstad, (1/26/98) at 25. Dr. Schneider agreed, testifying that this was a cutaneous malignancy located in the subcutaneous tissue, and there is no muscle in that area, Clerk's Papers 58 at 37-38, and that Mr. Seybold had a "cutaneous malignancy within the subcutaneous space." Clerk's Papers 62 at 51.
We conclude that one "relevant specialty" here is the removal of cutaneous malignancies located within the subcutaneous space. Dr. Schneider testified that he is an expert on what the range of appropriate surgical choices would be for dealing with a malignant sarcoma located subcutaneously on the distal third of the tibia. See Clerk's Papers 64-65 at 60-61. This is because he is a board certified plastic surgeon and "[c]utaneous malignancies are within the range of subjects which a plastic surgeon is expected to have familiarity with. They're included in our board examinations, and we are frequently asked to treat them." Clerk's Papers 65 at 61. Dr. Schneider further testified: "Many, many cutaneous and subcutaneous cancers are referred to plastic surgeons. We see an average of two or three a week here amongst us." Clerk's Papers 68 at 74.
We also conclude that another "relevant specialty" here is bone graftinggiven Dr. Flugstad's decision to remove bone and to graft with cadaver bone rather than live bone from Mr. Seybold's own body. Dr. Schneider testified that as a plastic surgeon he is qualified to graft bone and moreover that he has extensive experience in that field, including below the knee, because of his work in trauma surgery. Bone grafting in that area, *1076 according to Dr. Schneider is a "special problem" in which he has experience. Moreover, missing bones or bones that do not heal are "often referred to plastic surgeons for assistance." Clerk's Papers 67 at 71-72.
Thus, that Dr. Schneider is neither an orthopedic surgeon nor a musculoskeletal oncologistnor an oncologist at allis not dispositive. Neither is it dispositive that he himself is not trained to perform the Mohs technique of surgical removal of malignancies, for he is familiar with the procedure, works closely with physicians who employ it, and has even co-written a published article relating to the technique in conjunction with one of those physicians. See White, 61 Wash.App. at 173-74, 810 P.2d 4 (So long as a physician with a medical degree has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue, he or she will ordinarily be considered qualified to express an opinion with respect to such procedure or problem, even if not a specialist with respect to same (citing numerous authorities illustrative of the principle, which we omit for purposes of brevity)).
In sum, the trial court erred in ruling that Dr. Schneider was not qualified to be an expert witness in this case on the issues of the standard of care applicable to surgical removal of cutaneous malignancies located subcutaneously, bone grafting with cadaver bone versus live bone in the tibia, and proximate causation. We reverse the ruling and hold that Dr. Schneider is qualified to testify as to the matters outlined in this opinion relating to the medical negligence claim. His deposition raises genuine issues of material fact that must be decided by a trier of fact if this case cannot be otherwise resolved.
Informed Consent
The Seybolds also presented an additional theory based on an lack of informed consent. A doctor is liable for injuries from health care to which the patient did not consent. RCW 7.70.030(3). RCW 7.70.050 sets the standard for informed consent. A plaintiff alleging negligence on the basis of failure to obtain informed consent has the burden of establishing the following elements:
(a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;
(b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;
(c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;
(d) That the treatment in question proximately caused injury to the patient.
RCW 7.70.050; see also Bertsch v. Brewer, 97 Wash.2d 83, 90, 640 P.2d 711 (1982); Bays v. St. Lukes Hosp., 63 Wash.App. 876, 880-81, 825 P.2d 319 (1992).
The rule governing the necessity to disclose a given risk is the test of materiality. Smith v. Shannon, 100 Wash.2d 26, 31, 666 P.2d 351 (1983). As the Smith court explained,
The determination of materiality is a 2 step process. Initially, the scientific nature of the risk must be ascertained, i.e., the nature of the harm which may result and the probability of its occurrence. The trier of fact must then decide whether that probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment.
While the second step of this determination of materiality clearly does not require expert testimony, the first step almost as clearly does. Only a physician (or other qualified expert) is capable of judging what risks exist and their likelihood of occurrence. The central reason for requiring physicians to disclose risks to their patients is that patients are unable to recognize the risks by themselves. Just as patients require disclosure of risks by their physicians to give an informed consent, a trier of fact requires description of risks by an expert to make an informed decision.
Some expert testimony is thus necessary to prove materiality. Specifically, expert testimony is necessary to prove the existence *1077 of a risk, its likelihood of occurrence, and the type of harm in question.
Id. at 33-34, 666 P.2d 351 (citations omitted).
The Seybolds' informed consent claim hinges on their assertion, derived from the testimony of Dr. Schneider, that Dr. Flugstad failed to inform Mr. Seybold that there was an appropriate surgical alternative to a wide local excision in which bone tissue is removed. The Seybolds specifically argue that Dr. Flugstad failed to "discuss the risk of taking bone and the alternative to taking bone[.]" App. Reply Br. at 19. And they argue that Dr. Flugstad failed to "inform Charles Seybold that taking bone increased the risk of amputation, or that if there were no tumor in the bone there would be no medical reason to take bone." Id. at 20, 666 P.2d 351.
The determinations of whether there was a reasonable surgical alternative to taking bone, and whether there was medical reason to take bone, are essential issues in this case that are best established by an opinion that is beyond the expertise of a layperson. See Harris v. Robert C. Groth, M.D., 99 Wash.2d 438, 449, 663 P.2d 113 (1983). Expert testimony is, therefore, required to support the Seybolds' claims on these matters. The same is true of the decision to graft with cadaver bone instead of live bone from elsewhere in Mr. Seybold's body, once Dr. Flugstad made the decision to take bone. "The duty to disclose similarly attaches to recognized possible alternative forms of treatment and to the anticipated results of the treatment proposed and administered." Adams v. Richland Clinic, Inc., 37 Wash.App. 650, 657, 681 P.2d 1305 (1984) (citations omitted).
Just as we have concluded that Dr. Schneider is qualified to testify with respect to the claim of medical negligence, we also conclude that he is qualified to testify with respect to the medical issues relating to informed consent. Dr. Schneider testified not only that taking bone was unnecessary, but also that once the decision to take bone was made, grafting with live bone from elsewhere in Mr. Seybold's body, rather than with cadaver bone, would have greatly improved the odds against eventual pathologic fracture, nonunion and ultimate amputation. Dr. Schneider's testimony with respect to the probabilities in this regard, as well as his testimony that the likelihood that this particular type of malignancy had invaded bone was low, are such that a rational trier of fact could reasonably find that Dr. Flugstad failed to inform of material facts and that Charles Seybold consented to the treatment he received without being fully informed and would not have done so if he had been fully informed.
Reversed and remanded for trial or such other proceedings as shall be consistent with this opinion.
APPELWICK and GROSSE, JJ., concur.
NOTES
[1] This being a review of a summary judgment, we recount the facts in the light most favorable to the non-moving parties, here, the Seybolds.
[2] An allographic transplant utilizes cadaver bone, whereas an autographic transplant utilizes live bone tissue taken from another area of the patient's body.