# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ROBERT WILLIAMS,<br><br>    Appellant,<br><br>    v.<br><br>FRANCISCAN HEALTH SYSTEM d/b/a ST. JOSEPH HOSPITAL, MULTICARE HEALTH SYSTEM d/b/a GOOD SAMARITAN HOSPITAL, and JOHN DOES 1-10,<br><br>    Respondents. | DIVISION ONE<br><br>No. 83415-1-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — Robert Williams appeals from the trial court's summary judgment order dismissing his medical negligence claim against Franciscan Health System, d/b/a St. Joseph Hospital. Williams asserts that the record contains sufficient evidence to raise a genuine issue of material fact as to whether Franciscan Health caused Williams the loss of chance of a better outcome. However, Williams did not proffer expert testimony that included an opinion as to the percentage or range of percentage reduction of a better outcome that resulted from the defendant's wrongful actions. Because a plaintiff must produce such evidence in order to succeed on a lost chance of a better outcome claim, we affirm.

I

On September 15, 2015, at approximately 4:30 p.m., Robert Williams, according to his declaration, "experienced an unusual sensation in [his] right ear."

Immediately thereafter, Williams informed his wife that he was going to an urgent care facility. At 5:15 p.m., Williams arrived at an urgent care facility located in the city of Bonney Lake.

Upon his arrival at the urgent care facility, Williams "had symptoms of ear pain and dizziness." Thereafter, Williams was informed that he should go to Good Samaritan Hospital. Subsequently, Williams's wife drove him to that hospital.

Williams arrived at Good Samaritan Hospital around 6:24 p.m. Upon his arrival, Williams "was examined and imagining was ordered." As a result, Williams was scheduled to receive an MRI[1] scan. While Williams awaited this procedure, he vomited.

Employees at Good Samaritan Hospital discovered that Williams's insurance provider did not cover the medical services performed at Good Samaritan Hospital. As a result, an MRI was not performed at Good Samaritan Hospital.

Employees at Good Samaritan Hospital attempted to discharge Williams with a diagnosis of vertigo. However, Williams did not agree to be discharged, insisting that he was not suffering from vertigo. An employee at Good Samaritan Hospital subsequently contacted an employee at St. Joseph Hospital because Williams's insurance provider covered treatment at St. Joseph. Williams was subsequently transferred, via ambulance, to St. Joseph Hospital.

---

[1] Magnetic Resonance Imaging.

On September 16, 2015, at 12:46 a.m., Williams arrived at St. Joseph Hospital.  At 3:14 a.m., Williams was examined by a medical doctor.  The doctor ordered an MRI scan to determine whether Williams was suffering from a stroke.  Around 7:00 a.m., Williams experienced "numbness of the right side of the face and right facial droop."  The MRI scan did not occur until 8:35 a.m.

Williams did not recall his time at St. Joseph Hospital.  Instead, the first thing he remembered after agreeing to be transferred from Good Samaritan was "waking up at St. Joseph after having suffered a stroke."  Thereafter, Williams became "permanently disabled."  In particular, Williams lost his peripheral vision, lost the ability to hear from one of his ears, is unable to walk without assistance, is unable operate a motor vehicle, and "can no longer work."

On September 5, 2019, Williams filed a complaint against Franciscan Health System, d/b/a St. Joseph Hospital, MultiCare Health System, d/b/a Good Samaritan Hospital, and various unnamed defendants who were referred to as "John Does 1-10."  In his complaint, Williams alleged that the "[d]efendants committed negligent acts and omissions with regard to the medical care, or lack thereof, provided to Plaintiff on or about September 15, 2015 and thereafter."  The complaint further alleged that, as a result of this negligent conduct, Williams suffered his injuries.

In response to an interrogatory from Franciscan Health, Williams stated that Dr. Aaron Heide was the only expert witness that he intended to produce at trial.  Subsequently, during a deposition, Dr. Heide testified as follows with regard to Williams's chance of a better outcome:

Q.      Well, the question that you just asked sort of in your answer there was whether any treatment -- any of the treatments that he did eventually receive, whether any of those should have been given earlier based on what we later saw on the MRI.

A.      I think the key word in your question is "eventually." And I'm going to stick with my answer that the quicker the better in acute stroke and that eventually you get to a treatment. The question is would the treatment have been given earlier, would there be a better outcome? And we can't revise history. All I can say is that quicker and more information is better. Determining the mechanism of the injury allows you to treat quicker and better. And so eventually getting the treatment based on assessment and mechanistic injury determination at a later date, I don't think we can go back in history and say if he had received aspirin or statin or IV fluid earlier, would he have a better outcome, because we don't have that luxury. We just have what is presented to us.

All we know is from the standard of care is quicker, earlier the better.

Q.      So are you able to say more likely than not, if he had received, for example, aspirin earlier, his outcome would be different?

A.      I'm not that powerful of a being to know that. But we do know in acute stroke, quicker and sooner is better.

On October 30, 2020, Franciscan Health filed a motion for summary judgment. In this motion, Franciscan Health asserted, in part, that Williams failed to establish a genuine issue of material fact with regard to whether Franciscan Health caused any injury to Williams.

On December 8, 2020, Williams filed a signed declaration of Dr. Heide which contained the following statements regarding Williams's loss of chance for a better outcome:

8.      With stroke time is brain. In other words the longer treatment is delated the more brain is damaged.
9.      Since stroke was on the differential, St. Joseph needed to act expeditiously in assessing Mr. Williams. It failed to do so, and that failure violated the required standard of care.
10.      The delay of diagnosis led to delay of treatment. Delay of treatment led to the loss of chance for a better outcome.

11.     It is likely MRI imaging performed at St. Joseph at any time after Mr. Williams arrive[d] would have revealed the stroke, presumably leading to an appropriate response, which likely would have included Plavix, among other therapies. Because ischemic stroke was not diagnosed until 8:35 a.m. and Plavix was not given until 10:03 a.m., Mr. Williams' [sic] lost a chance for a better outcome. It is possible that Plavix administration before the onset of the more serious symptoms at 7:00 a.m. would have prevented the later more serious brain injury suffered by Mr. Williams.

12.     Although content of the telephone call between physicians related to the transfer is not documented, it is inconceivable that the call would not have included discussion of Mr. Williams' symptoms and the fact that an MRI had been ordered, but not performed, at Good Samaritan. If this did not occur, then failure to share the information was a violation of the required standard of care by Good Samaritan and failure to inquire was a violation of the required standard of care by St. Joseph.

13.     It is not possible to determine with precision the extent of brain damage caused by the delay in treatment at St. Joseph. However, it is clear that Mr. Williams' stroke related symptoms considerably worsened while at St. Joseph prior to the MRI and diagnosis. This likely represented worsening damage to Mr. Williams' brain as time passed.

. . . .

15.     The reason aspirin, statin and IV fluids are given in the sub acute phase of stroke is to improve outcome. Failure to MRI sooner delayed delivery of therapies. Harm caused [to] the brain as a result cannot be quantified, but it is known that time is brain in stroke and quicker is better. Delay in this case resulted in a loss of chance for a better outcome.

16.     Mr. Williams is now totally disabled. He cannot walk without assistance. He cannot drive. He has lost hearing in one of his ears. He has lost peripheral vision. With appropriate intervention at Good Samaritan and St. Joseph it is possible these problems could have been minimized or avoided altogether.

On December 18, 2020, the trial court heard Franciscan Health's motion for summary judgment. During the hearing, the trial court ruled that Williams failed to establish a genuine issue of material fact on his loss of chance claim because the evidence he proffered did not include expert testimony as to the percentage of the loss of chance of a better outcome he sustained. That same

5

day, the trial court entered a written order granting the motion for summary judgment and dismissing with prejudice Williams's claims against Franciscan Health.[2]

Williams appeals.

II

Williams contends that the trial court erred by granting Franciscan Health's motion for summary judgment. This is so, he avers, because he was not required to produce expert testimony regarding the percentage or range of percentage reduction in the chance of a better outcome he sustained in order to advance his lost chance claim. To the contrary, authority holds that Williams was required to produce such testimony in order to advance a lost chance of a better outcome claim. Accordingly, the trial court did not err.

A

We review an order granting summary judgment de novo, performing the same inquiry as the trial court. Nichols v. Peterson Nw., Inc., 197 Wn. App. 491, 498, 389 P.3d 617 (2016). In so doing, we draw "all inferences in favor of the nonmoving party." U.S. Oil & Ref. Co. v. Lee & Eastes Tank Lines, Inc., 104 Wn. App. 823, 830, 16 P.3d 1278 (2001). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c).

---

[2] On February 22, 2021, the trial court entered a stipulated order dismissing Williams's claims against MultiCare Health System.

6

"A plaintiff seeking damages for medical malpractice must prove his or her 'injury resulted from the failure of a health care provider to follow the accepted standard of care.'" Keck v. Collins, 184 Wn.2d 358, 371, 357 P.3d 1080 (2015) (quoting RCW 7.70.030(1)).  To prove such a claim the plaintiff must establish the following statutory elements:

> The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:
>     (1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances;
>     (2) Such failure was a proximate cause of the injury complained of.

Former RCW 7.70.040 (2020).

"Washington recognizes loss of chance as a compensable interest." Shellenbarger v. Brigman, 101 Wn. App. 339, 348, 3 P.3d 211 (2000).  "A lost chance claim is not a distinct cause of action but an analysis within, a theory contained by, or a form of a medical malpractice cause of action." Rash v. Providence Health & Servs., 183 Wn. App. 612, 629-30, 334 P.3d 1154 (2014).

Medical negligence claims alleging a loss of chance are divided into two categories: (1) loss of chance of survival, and (2) loss of chance of a better outcome.  See Herskovits v. Grp. Health Coop. of Puget Sound, 99 Wn.2d 609, 619, 634, 664 P.2d 474 (1983) (lead opinion) (Pearson, J., concurring) (recognizing a medical negligence claim for loss of chance of survival); Mohr v. Grantham, 172 Wn.2d 844, 857, 262 P.3d 490 (2011) (recognizing a medical negligence claim for loss of chance of a better outcome).

"In a lost chance of survival claim, the patient died from a preexisting condition and would likely have died from the condition, even without the negligence of the health care provider. Nevertheless, the negligence reduced the patient's chances of surviving the condition." Rash, 183 Wn. App. at 630 (citing Herskovits, 99 Wn.2d 609). Accordingly, a lost chance of survival claim must be distinguished from a traditional medical malpractice claim wherein the negligent act proximately caused the patient's death:

> We distinguish between a lost chance of survival theory and a traditional medical malpractice theory. In the latter, but for the negligence of the health care provider, the patient would likely have survived the preexisting condition. In other words, the patient had a more than 50 percent chance of survival if the condition had been timely detected and properly treated. In a lost chance claim, the patient would likely have died anyway even upon prompt detection and treatment of the disease, but the chance of survival was reduced by a percentage of 50 percent or below.

Rash, 183 Wn. App. at 630-31.

Next, "[i]n a lost chance of a better outcome claim, the mortality of the patient is not at issue, but the chance of a better outcome or recovery was reduced by professional negligence." Rash, 183 Wn. App. at 631 (citing Mohr, 172 Wn.2d at 857). Therefore, a lost chance of a better outcome claim must also be distinguished from a traditional medical malpractice claim:

> In a traditional medical malpractice case, the negligence likely led to a worse than expected outcome. Under a lost chance of a better outcome theory, the bad result was likely even without the health care provider's negligence. But the malpractice reduced the chances of a better outcome by a percentage of 50 percent or below.

Rash, 183 Wn. App. at 631.

8

Notably, "expert testimony is required to establish the standard of care and most aspects of causation in a medical negligence action." Seybold v. Neu, 105 Wn. App. 666, 676, 19 P.3d 1068 (2001). In a lost chance case, "a plaintiff need not forward medical testimony that negligence of the health care provider was the likely cause of [the underlying] injury." Christian v. Tohmeh, 191 Wn. App. 709, 730, 366 P.3d 16 (2015) (citing Rash, 183 Wn. App. at 636). However, such a "plaintiff must provide a physician's opinion that the health care provider 'likely' caused a lost chance." Christian, 191 Wn. App. at 730 (citing Rash, 183 Wn. App. at 631).

As a result, "[i]n a lost chance suit, a plaintiff carries the burden of producing expert testimony that includes an opinion as to the percentage or range of percentage reduction of the better outcome." Christian, 191 Wn. App. at 731. "Without that percentage, the court would not be able to determine the amount of damages to award the plaintiff, since the award is based on the percentage of loss." Rash, 183 Wn. App. at 636. After all, "[d]iscounting damages by that percentage responds to a concern of awarding damages when the negligence was not the proximate cause or likely cause of the" underlying injury. Rash, 183 Wn. App. at 636. "Otherwise, the defendant would be held responsible for harm beyond that which it caused." Rash, 183 Wn. App. at 636.

B

Turning to the challenge raised on appeal, the trial court did not err by granting Franciscan Health's motion for summary judgment. Neither the deposition of Dr. Heide nor the declaration of Dr. Heide provided an opinion on a

9

percentage or a range of percentage reduction of the chance of a better outcome. To the contrary, during his deposition, Dr. Heide stated:

> I don't think we can go back in history and say if he had received aspirin or statin or IV fluid earlier, would he have a better outcome, because we don't have that luxury. . . . All we know is from the standard of care is quicker, earlier the better.

Likewise, in his declaration, Dr. Heide stated:

> It is not possible to determine with precision the extent of brain damage caused by the delay in treatment at St. Joseph. However, it is clear that Mr. Williams' stroke related symptoms considerably worsened while at St. Joseph prior to the MRI and diagnosis. This likely represented worsening damage to Mr. Williams' brain as time passed.

This declaration also included several speculative and conclusory statements with regard to causation. In particular, Dr. Heide stated both that, "[i]t is *possible* that Plavix administration before the onset of the more serious symptoms at 7:00 a.m. would have prevented the later more serious brain injury" and that, "[w]ith appropriate intervention at Good Samaritan and St. Joseph[,] it is *possible* [Williams's] problems could have been minimized or avoided altogether." (Emphasis added.) Additionally, Dr. Heide conclusively declared that "[d]elay in this case resulted in a loss of chance for a better outcome."

Because Williams did not proffer evidence that included expert testimony setting forth an opinion, on a more likely than not basis, as to the percentage or range of percentage reduction of a chance of a better outcome suffered by Williams, the trial court did not err by granting Franciscan Health's motion for summary judgment. See Christian, 191 Wn. App. at 731; Rash, 183 Wn. App. at 636.

10

The speculative and conclusory statements made by Dr. Heide were insufficient to survive summary judgment. Under CR 56(e), "[a]ffidavits containing conclusory statements without adequate factual support are insufficient to defeat a motion for summary judgment." Guile v. Ballard Cmty. Hosp., 70 Wn. App. 18, 25, 851 P.2d 689 (1993). In particular, in a medical negligence case,

> the evidence must "rise above speculation, conjecture, or mere possibility." "[M]edical testimony must demonstrate that the alleged negligence 'more likely than not' caused the later harmful condition leading to injury; that the defendant's actions 'might have,' 'could have,' or 'possibly did' cause the subsequent condition is insufficient."

Shellenbarger, 101 Wn. App. at 348 (alteration in original) (citation omitted) (quoting Attwood v. Albertson's Food Ctrs., Inc., 92 Wn. App. 326, 331, 966 P.2d 351 (1998)).

Williams avers that "the Supreme Court has never made percentage testimony a requirement to recover for loss of chance" and that "[t]he Supreme Court has so far declined to address the issue when it has been presented."[3] Williams is correct that our Supreme Court has not expressly held that a plaintiff advancing a lost chance claim must produce expert testimony providing a percentage or range of percentage reduction in the chance of either survival or a better outcome. However, in every case in which our Supreme Court has addressed a lost chance claim, such evidence was submitted. See Dunnington v. Virginia Mason Med. Ctr., 187 Wn.2d 629, 636, 389 P.3d 498 (2017) (expert testimony providing that the negligent act caused a 40 percent reduction in

---

[3] Br. of Appellant at 9-10.

11

chance of a better outcome); Mohr, 172 Wn.2d at 849 (expert testimony providing that the negligent act caused a 50 to 60 percent reduction in chance of a better outcome);[4] Herskovits, 99 Wn.2d at 611 (expert testimony providing that the negligent act caused a 14 percent reduction in chance of survival).[5]

Furthermore, Justice Pearson's plurality opinion in Herskovits, which was later adopted by the court in Mohr, demonstrates the necessity of the plaintiff providing percentage testimony in order to be entitled to advance a loss of chance claim:

> Under the all or nothing approach, . . . a plaintiff who establishes that but for the defendant's negligence the decedent had a 51 percent chance of survival may maintain an action for that death. The defendant will be liable for all damages arising from the death, even though there was a 49 percent chance it would have occurred despite his negligence. On the other hand, a plaintiff who establishes that but for the defendant's negligence the decedent had a 49 percent chance of survival recovers nothing.

---

[4] In Rash, the court noted:
One wonders if Mohr should be treated as a lost chance case, since under traditional proximate cause principles, Mohr needed to only establish by a 51 percent chance that the alleged negligence caused her increased disability. Perhaps the case was considered one involving a lost chance because the range of percentages dipped below 51 percent by one percent. The trial court granted Grantham summary judgment dismissing the suit because Mohr could not show "but for" causation.
183 Wn. App. at 634 n.1.
In other words, because the expert testimony provided a range of percentage of loss that included 50 percent, Mohr was entitled to advance a loss of chance claim. It is worth noting that, when a plaintiff presents expert testimony that includes a range of percentage reduction from either below or at 50 percent to greater than 50 perfect, the plaintiff may advance, in the alternative, both a loss of chance claim and a traditional negligence claim. See, e.g., Estate of Dormaier v. Columbia Basin Anesthesia, PLLC, 177 Wn. App. 828, 853, 313 P.3d 431 (2013).

[5] Additionally, in Volk v. DeMeerleer, 187 Wn.2d 241, 279, 386 P.3d 254 (2016), our Supreme Court explained that "the loss of a chance doctrine is inapplicable if the plaintiff is alleging that the defendant's negligence actually caused the unfavorable outcome—the tortfeasors would then be responsible for the actual outcome, not for the lost chance." This holding reinforces the need for expert testimony providing a percentage or range of percentage reduction in the chance of either survival or a better outcome.

This all or nothing approach to recovery is criticized by King[6] on several grounds, 90 Yale L.J. at 1376-78. First, the all or nothing approach is arbitrary. Second, it

subverts the deterrence objectives of tort law by denying recovery for the effects of conduct that causes *statistically demonstrable losses*. . . . A failure to allocate the cost of these losses to their tortious sources . . . strikes at the integrity of the torts system of loss allocation.

90 Yale L.J. at 1377. Third, the all or nothing approach creates pressure to manipulate and distort other rules affecting causation and damages in an attempt to mitigate perceived injustices. . . . Fourth, the all or nothing approach gives certain defendants the benefit of an uncertainty which, were it not for their tortious conduct, would not exist. . . . Finally, King argues that the loss of a less than even chance is a loss worthy of redress.

. . . [T]he best resolution of the issue before us is to *recognize the loss of a less than even chance as an actionable injury*. Therefore, I would hold that plaintiff has established a prima facie issue of proximate cause by producing testimony that defendant probably caused a substantial reduction in Mr. Herskovits' chance of survival.

Herskovits, 99 Wn.2d at 633-34 (Pearson, J., concurring) (emphasis added) (some alterations in original); accord Mohr 172 Wn.2d at 857 ("We . . . formally adopt the reasoning of the Herskovits plurality.").

Thus, in order for a plaintiff to demonstrate that the plaintiff was *injured* so as to be entitled to advance a loss of chance claim, the plaintiff must demonstrate that the defendant caused a loss of chance by a percentage of 50 percent or less. Without such evidence, there is nothing preventing the defendant from being improperly held liable for causing the *underlying* injury, which is *not* the actionable injury in a loss of chance claim. Instead, as our

---

[6] Joseph H. King, Jr. was a legal commentator who promoted the theory of loss of chance of survival. His work was relied on in the Herskovitz plurality. See *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353 (1981).

Supreme Court has made clear, the actionable injury in a loss of chance claim is *the loss of chance.* Whether it is the lost chance to survive or the lost chance of a better outcome short of death, it is this loss, not the loss caused by the underlying injurious event, that is the focus of the claim. In this way, when the defendant's wrongful conduct falls short of being, more likely than not, the cause of the death or injury short of death, the plaintiff can seek redress for the share of damages incurred as a result of the defendant's tortious conduct (as opposed to the totality of the loss suffered by the plaintiff). Mohr, 172 Wn.2d at 857; Herskovits, 99 Wn.2d at 633-34 (Pearson, J., concurring). Therefore, a plaintiff in a loss of chance case bears the burden of establishing, by expert testimony, that the percentage or range of percentage of the lost chance of a better outcome amounted to either 50 percent or less.[7]

Williams next asserts that requiring an expert witness to provide a percentage or range of percentage reduction of the chance of a better outcome invades the province of the jury. In support of this argument, Williams cites to Sofie v. Fibreboard Corp., 112 Wn.2d 636, 771 P.2d 711, 780 P.2d 260 (1989). That case concerned a constitutional challenge to a statute that "place[d] a limit

---

[7] During oral argument, Williams asserted that, pursuant to James v. United States, 483 F. Supp. 581 (N.D. Cal. 1980), which was cited by our Supreme Court in Herskovits, a plaintiff advancing a loss of chance claim does not bear the burden of producing such percentage testimony. In that case, a federal trial court ruled that the "Plaintiffs' failure to establish the premise for the loss of a statistically measurable chance of survival does not . . . rule out recovery." James, 483 F. Supp. at 586. After reviewing this authority, we disagree.

There are at least two reasons why James is of no aid to Williams. First, the decision therein was rendered by a federal district court applying California, not Washington, law. James, 483 F. Supp. at 583. Second, in Herskovits, a plurality of our Supreme Court cited the James decision with approval only insofar as that decision "view[ed] the reduction in or loss of the chance of survival, rather than the death itself, as the injury" in a loss of chance of survival case. 99 Wn.2d at 632 (Pearson, J., concurring). Thus, the Herskovits plurality did not cite James for the proposition that a plaintiff need not produce expert testimony regarding the percentage or range of percentage reduction of the chance of survival suffered by the plaintiff.

on the noneconomic damages recoverable by a personal injury or wrongful death plaintiff." Sofie, 112 Wn.2d at 638. Our Supreme Court held that the statute at issue violated article I, section 21 of the Washington Constitution by interfering with the jury's traditional function to determine damages. Sofie, 112 Wn.2d at 638.

However, requiring a plaintiff to produce expert testimony establishing the percentage or range of percentage reduction of a chance of a better outcome does not interfere with the jury's traditional function to determine damages. Rather, as already explained, such testimony is necessary for a plaintiff to establish that the plaintiff was, in fact, *injured* in a manner that allows the advancement of a loss of chance claim. Indeed, the requirement of such testimony in no way improperly limits the amount of damages that the jury may award. To the contrary, the existence of such evidence ensures that the jury, in awarding damages, does not hold the defendant responsible for damages caused by the underlying injury as opposed to damages caused by the negligence that resulted in the lost chance. Rash, 183 Wn. App. at 636.

The trial court properly granted Franciscan Health's motion for summary judgment.

Affirmed.

No. 83415-1-I/16

WE CONCUR:

_____   _____
Mann, J.                    Verellen, J.