IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ROBIN RASH, as Personal Representative of the ESTATE OF BETTY L. ZACHOW, deceased, and on behalf of all statutory claimants and beneficiaries; Robin R. Rash, Keith R. Zachow and Craig L. Zachow, | ) ) ) ) ) ) ) | No. 31277-1-III |
| Appellants, | ) ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| PROVIDENCE HEALTH & SERVICES, a Washington business entity and health care provider; PROVIDENCE HEALTH & SERVICES-WASHINGTON, a Washington business entity and health care provider; PROVIDENCE-SACRED HEART MEDICAL CENTER & CHILDREN'S HOSPITAL, a Washington business entity and health care provider, and DOES 1-10, | ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

FEARING, J. — Plaintiff Robin Rash invites us to enter a path untraveled. She brings a medical malpractice claim, on behalf of her mother's estate, in the form of a lost chance, when she has no expert testimony as to a percentage of a lost chance and only expert testimony that the medical negligence may have shortened her mother's life. She has no testimony as to the length of the mother's decreased life expectancy. We decline

the request to follow an unchartered course, and we affirm the trial court's grant of summary judgment on behalf of Sacred Heart Medical Center. A higher authority will need to map any new trail.

## FACTS

On March 5, 2008, Betty Zachow, age 82, underwent a right knee replacement surgery at Sacred Heart Medical Center (SHMC). Prior to surgery, she provided SHMC a list of her medications, including metoprolol, a beta blocker used to treat high blood pressure. Before surgery, Zachow also suffered from hypertrophic cardiomyopathy, or enlargement of the heart, a genetic condition, left ventricle outflow obstruction, and mild to moderate mitral valve stenosis. Beta blockers reduced the heart rate. The beta blockers also reduced the chance of emboli and strokes.

After surgery, SHMC failed to give Betty Zachow two doses of metoprolol, one during the evening of March 5 and one the following morning. On March 6, Zachow suffered a series of complications, including tachycardia and acute pulmonary edema, and was transferred to the SHMC's Intensive Care Unit. Tachycardia is a rapid heartbeat and pulmonary edema is the filling of lungs with fluid. Zachow recovered and, 10 days after she entered the hospital, SHMC released her.

According to Robin Rash's medical expert, Dr. Wayne Rogers, Betty Zachow suffered acute pulmonary edema and aspiration pneumonia as a result of SHMC's failure to provide the two doses of metoprolol. The edema and pneumonia aggravated Zachow's

weakened heart. Acute pulmonary edema also reduced oxygen saturation to the brain. According to Dr. Rogers, Zachow should have been discharged one day after the surgery, but instead a "profound illness" resulted in a 10-day stay. According to Rogers, Zachow left SHMC in a weakened state from which she never fully recovered. Rogers concedes, however, that Zachow's heart condition would have continued to deteriorate even without SHMC's omission of medication.

On April 18, 2008, the SHMC's Director of Risk Management acknowledged the medication error and offered to waive the charges for Betty Zachow's care. Zachow never responded. Over the next two years Zachow suffered two strokes.

## PROCEDURE

This appeal has a complicated procedural background, which includes two lawsuits, later consolidated in the trial court. The background complicates a resolution of the appeal but does not impact its substantive outcome.

On January 7, 2010, Betty Zachow filed a complaint, under Spokane County Superior Court Cause No. 10-2-00084-9, alleging that as a result of SHMC's negligence, she developed cardiomyopathy and suffered physical injury, emotional distress, and "reduced life expectancy," among other injuries. Clerk's Papers (CP) at 6. She did not specifically allege a loss in her chances to survive. On March 21, 2010, Zachow suffered her third stroke and died. The stroke was the result of a cardiac embolism to the head.

On April 15, 2010, Betty Zachow's counsel sent a letter to SHMC informing it

3

that he intended to substitute a personal representative for Zachow and "file an amended complaint to include the Estate's claims, and include the claims of the Zachow adult children as statutory beneficiaries." CP at 99. The beneficiaries are Robin Rash and her two brothers, sons of Betty Zachow. Robin Rash, Zachow's daughter, was appointed Zachow's personal representative but Rash never moved for leave to amend nor filed an amended complaint. The parties, nonetheless, beginning in at least March 2011, if not earlier, filed pleadings in Spokane County Superior Court Cause No. 10-2-00084-9, whose captions removed Betty Zachow as plaintiff and named, as plaintiff, "Robin Rash, [individually and] as Personal Representative of the Estate of Betty L. Zachow, deceased, and on behalf of all statutory claimants and beneficiaries." CP at 191.

On March 26, 2012, the parties filed a trial management joint report, in which Robin Rash wrote, "Betty's adult children suffered from the untimely loss of [Zachow], due to [SHMC's] negligence." CP at 13. In response, SHMC sent a letter claiming the report was the first time it heard Rash sought survival damages for Zachow's statutory beneficiaries separate and apart from the claims made by her estate.

In a motion in limine, filed on March 30, 2012, SHMC moved to preclude, at trial, any reference to Betty Zachow's loss of chance of survival theory because the theory was not pled. SHMC also argued in its trial brief that Rash must establish SHMC's negligence was the "but for" cause of Zachow's injuries. CP at 235.

4

Robin Rash's trial brief, filed on April 3, 2012, argued that her original complaint gave SHMC notice that she intended to bring a lost chance of survival claim. Rash cited the original complaint's language that Zachow suffered from "reduced life expectancy." In the brief, Rash also contended that one "can bring a claim for loss of chance of survival and/or for wrongful death, based upon the substantial factor doctrine." CP at 241. To support her claim, Rash cited to deposition testimony of Wayne R. Rogers, who opined that SHMC "promoted" or "accelerated" the disease process. CP at 242. Dr. Rogers could not provide a "mathematical figure" as to the degree SHMC accelerated the disease, but noted it was significant. CP at 73, 242.

During questioning by defense counsel at Dr. Rogers' deposition, Rogers testified:

"Q. Doctor, just a couple follow-ups. Your bottom-line opinion is that because of the events in Sacred Heart in March of 2008, Ms. Zachow's deterioration was accelerated? Is that what you're basically saying?
A. Or promoted. She eventually would have died anyway, as we all do, but she had a promotion of her disease process.
Q. And you can't state, as we sit here today, how much her disease was promoted or accelerated; is that correct?
A. I can't give you a mathematical figure, but I would say it was significant and led to her death.
Q. Other than being significant and ultimately, in your opinion, resulting to her death, you can't go any farther than that?
A. No, I don't think I can."

CP at 242 (emphasis omitted).

On April 4, 2012, SHMC moved to strike Robin Rash's loss of chance "cause of action or, in the alternative, to continue the trial date." CP at 35. In its motion, SHMC claimed Rash never pled, disclosed in any answers, or developed any expert testimony to

support a reduced loss of chance claim. Dr. Rogers' testimony, SHMC contended, was insufficient to establish SHMC as the "but for" cause of Zachow's loss of chance. CP at 36. In response to SHMC's motion to strike any lost chance theory, Rash moved to amend her complaint to include two new claims (1) loss of chance and (2) wrongful death damages on behalf of all statutory claimants. Rash did not complain that SHMC's motion to strike was a disguised summary judgment motion. Nor did she contend she needed additional time to respond to the motion to strike. Instead, Rash joined with SHMC's request to shorten the time for the hearing on the motion to strike and her motion to amend the complaint.

On April 12, 2012, the trial court concluded that Robin Rash lacked the requisite evidence to support a lost chance of survival claim or a lost chance of a better outcome claim. The trial court ruled that there was no justification to deviate from the traditional "but for" causation standard applied to medical malpractice cases. CP at 141. The trial court also decided that Rash failed to plead the wrongful death claims. The court denied Rash's motion to amend her complaint and granted SHMC's motion to strike Rash's claims for loss of chance and wrongful death. Though SHMC cast its motion as a motion to strike, both parties and the trial court treated the motion as a motion for partial summary judgment. The parties submitted declarations and documentary evidence in support and in opposition to the motion. The motion focused on whether Rash made a prima facie case of a lost chance.

6

On April 16, 2012, Robin Rash, under Spokane County Superior Court Cause No. 12-2-01478-1, filed a separate action as personal representative of her mother's estate on behalf of the estate, her two brothers, and herself. She alleged SHMC's negligence in health care caused Betty Zachow a rapid and irregular heartbeat and permanent physical injury, exacerbated her genetic heart condition, increased the likelihood of an adverse heart attack or stroke, accelerated her decline, and was a proximate cause or substantial factor in her death. The second complaint also omits the term "lost chance of survival." The complaint seeks to recover damages on behalf of Betty Zachow's children under Washington's wrongful death laws.

In July 2012, Robin Rash moved to consolidate the two actions, Spokane County Superior Court Cause No. 10-2-00084-9 and Spokane County Superior Court Cause No. 12-2-01478-1, and the court granted her motion. The order of consolidation reads, in part:

> (2) Spokane County Cause No. 12201478-1 is hereby consolidated, for all purposes, into, and together with, Spokane County Cause No. 10200084-9, the remaining action to be recaptioned to reflect the addition of plaintiff Robin Rash as Personal Representative of the Estate of Betty L. Zachow, deceased, and on behalf of all statutory claimants and beneficiaries: Robin R. Rash, Keith R. Zachow and Craig L. Zachow.

CP at 191.

On September 21, 2012, SHMC moved, pursuant to CR 54(b), to certify the trial court's April order striking Rash's loss of chance claim in cause No. 10-2-00084-9. SHMC contended Rash asserted multiple claims for relief and no just reason existed to

7

delay entry of judgment. The motion did not expressly seek the application of the April ruling to the second consolidated action. Nevertheless, the memorandum in support of the motion preached against a "second bite at the apple." CP at 204.

In response to the motion for certification, Robin Rash contended that procedurally the consolidated matter is a new action and the prior order striking the loss of chance "claim" should be disregarded, as the basis for SHMC's earlier motion to dismiss was a surprise. CP at 212. In the event the trial court agreed that Robin Rash could not pursue a lost chance "claim" in the new action, Rash joined SHMC's request that the court certify its April 2012 order as final for purposes of appeal. Although Rash mentioned that she might hire a new medical expert, Rash did not ask the court for a continuance of the motion for certification. Nor did she ask the trial court for the opportunity to file additional affidavits or other evidence to thwart dismissal of the loss of chance claim.

On October 5, 2012, the trial court conducted a hearing on SHMC's motion for certification, although the parties filed additional pleadings in support and in opposition to the motion thereafter. On October 19, the trial court ruled in SHMC's favor and certified its order striking Rash's loss of chance claim. The trial court did not expressly rule that the dismissal of the lost chance claim applied to the second, but consolidated, suit. The order of certification included both suit's captions, but someone struck the number 12-2-01478-1 in the caption.

8

LAW AND ANALYSIS

ISSUE 1: Whether the trial court erred when it refused to permit Rash to amend her complaint in the first suit?

ANSWER 1: We do not address the question since the issue is moot.

Robin Rash assigns error to the trial court's refusal, in April 2012, to grant her motion to amend her complaint in the first filed action. The motion sought to add loss of a chance of survival and wrongful death claims. This court, after the trial court's ruling, held that a lost chance claim is not distinct from a medical malpractice claim and that the pleading of a medical malpractice cause of action suffices for the plaintiff to forward a claim of lost chance of survival. *Estate of Dormaier v. Columbia Basin Anesthesia, PLLC*, 177 Wn. App. 828, 313 P.3d 431 (2013). Nevertheless, we need not address this assignment of error since the filing of the second lawsuit and consolidation with the first suit cured any error. The 2012 complaint does not specifically allege a claim for lost chance of survival, but pleads a claim of health care negligence. The parties, on appeal, assume that the second complaint added the allegation of a lost chance. Generally, this court will not consider a moot issue unless it involves matters of continuing and substantial public interest. *Bavand v. OneWest Bank, F.S.B.*, 176 Wn. App. 475, 510, 309 P.3d 636 (2013).

ISSUE 2: Did the trial court err when it entertained SHMC's motion to dismiss the lost chance theory in the 2010 case and certification of that order, without the filing

by SHMC of a summary judgment motion?

ANSWER 2: Assuming any error, we do not address the error because Robin Rash failed to object to the process at the trial court.

Robin Rash contends the trial court erred in September 2012 when it certified as final its April 2012 ruling dismissing Rash's loss of chance claim and thereby applying the ruling to the second action brought for wrongful death and survival. The second action was consolidated with the first suit after the April ruling. In this second assignment of error, Rash asserts both substantive error and procedural error. According to Rash, the trial court should have granted Rash more time to defend the April 2012 motion to strike any lost chance theory, since the motion was essentially one for summary judgment. According to Rash, the trial court should have also granted her more time to respond to the September motion for certification and treated the CR 54(b) motion as a summary judgment motion under CR 56.

Robin Rash encounters an insurmountable obstacle when asserting that she should have received more time to prepare a response to the April motion to strike and the September motion to certify the April ruling as final. Rash never asked for additional time to develop more evidence before the trial court entertained either motion. Instead, Rash joined in SHMC's request for expedited review of the April motion. Rash, on neither occasion below, complained that either the motion to strike or the motion to certify were disguised summary judgment motions that required a lengthier notice than

10

given.

An appeals court will not review an issue, theory, argument, or claim of error not presented at the trial court level. RAP 2.5(a); *Lindblad v. Boeing Co.*, 108 Wn. App. 198, 207, 31 P.3d 1 (2001). A party must inform the court of the rules of law it wishes the court to apply and afford the trial court an opportunity to correct any error. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983). The purpose of this general rule is to give the trial court an opportunity to correct errors and avoid unnecessary rehearings. *Postema v. Postema Enters., Inc.*, 118 Wn. App. 185, 193, 72 P.3d 1122 (2003). Thus, we refuse to entertain Robin Rash's argument that she should have been given more time to respond to both motions. She could have corrected any error and saved the court system time by asserting her argument before the trial court.

ISSUE 3: Did the trial court err when applying the dismissal of the lost chance theory in the 2010 suit to the 2012 suit, when the statutory beneficiaries of the wrongful death action were not parties to the first case?

ANSWER 3: We do not address this assignment of error since we conclude that the trial court did not attach the dismissal of the lost chance theory to the 2012 suit.

Robin Rash next argues that the trial court erred when ruling that the April dismissal of the lost chance theory in the 2010 suit applied to beneficiaries of the new 2012 suit. This argument assumes that the trial court issued such a ruling. We read the record before us otherwise. The order of certification, after consolidation of the two

11

suits, does not state that the dismissal of any lost chance theory applies to the 2012 suit. Someone struck from the order the case number of the 2012 suit. The striking of the number may be the result of the clerk's preference of only one cause number on the caption and the traditional use of the earliest cause number, rather than any desire that the dismissal not apply to the second suit. Nevertheless, the fact remains that the order of certification does not state that any lost chance theory is dismissed from the 2012 suit. Also, SHMC's motion did not expressly ask for a ruling applying the dismissal order to the 2012 case.

We find no case that addresses whether a ruling from a first suit applies to a second suit after consolidation of the two suits, or, more particularly, whether dismissal of a theory in the first suit automatically means that same theory is dismissed in a second suit upon consolidation. Principles from many foreign decisions, decided in distinct contexts, support a conclusion that the ruling in the first case does not extend to the second case.

The pleadings and depositions in suit number one are not part of suit number two. *Bouldin v. Taylor*, 152 Tenn. 97, 275 S.W. 340, 349 (1925). It is perfectly well settled in Tennessee that the order of consolidation has no such effect. *Bouldin*, 275 S.W. at 349. The rights of the litigants must still turn on the pleadings, proof, and proceedings of their respective suits. *Bouldin*, 275 S.W. at 349. Consolidation does not change the rules of equity pleading, nor the rights of the parties, as those rights must still turn on the

pleadings, proofs, and proceedings in their respective suits. *Bouldin*, 275 S.W. at 349. The parties in one suit do not thereby become parties in the other, and a decree in one is not a decree in the other, unless so directed. *Bouldin*, 275 S.W. at 349. It operates as a mere carrying on together of two separate suits supposed to involve identical issues and is intended to expedite the hearing and diminish expense. *Bouldin*, 275 S.W. at 349.

Consolidation does not merge two suits into a single cause, change the rights of the parties, or make those who are parties in one suit parties in another. *Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 676 (5th Cir. 2011). Under a consolidation order, the parties and the pleadings are not merged, and each action retains its own identity. *Ellis by Ellis v. Oliver*, 307 S.C. 365, 415 S.E.2d 400 (1992). Missouri courts have recognized that when actions are consolidated only for joint hearing or trial, the rights of action are not merged into one but remain separate and distinct. *Moss v. Home Depot USA, Inc.*, 988 S.W.2d 627, 630 (Mo. App. E.D. 1999). Consolidation affects the procedure of the cases, but has no effect on the substantive rights of the parties in an individual case and does not destroy their separate identities. *CDI Contractors, LLC. v. Allbrite Elec. Contractors, Inc.*, 836 So.2d 1031, 1033 (Fla. 5th DCA 2002). Cases do not lose their separate status merely because they are consolidated for processing and trial. *County Comm'rs of Carroll County v. Carroll Craft Retail, Inc.*, 384 Md. 23, 33, 862 A.2d 404 (2004). A consolidation of actions does not affect the rights of the parties. *Wouldridge v. Burns*, 265 Cal. App. 2d 82, 86, 171 Cal. Rptr. 394 (1968).

Where several actions are ordered to be consolidated for trial, each action retains its separate identity and thus requires the entry of a separate judgment. *Solomon v. Liberty Nat'l Life Ins. Co.*, 953 So.2d 1211 (Ala. 2006). Moreover, an order of consolidation does not merge the actions into a single action, change the rights or the parties, or make those who are parties to one action parties to another. *Pitts v. Jim Walter Resources, Inc.*, 994 So.2d 924, 930 (Ala. Civ. App. 2007). In consolidated actions, the parties and pleadings in one action do not become parties and pleadings in the other. *Pitts*, 994 So.2d at 930.

Finally, from the Napoleonic Code state, the consolidation of actions pursuant to LSA-C.C.P. art. 1561 is a procedural convenience designed to avoid multiplicity of actions and does not cause a case to lose its status as a procedural entity. *Howard v. Hercules-Gallion Co.*, 417 So.2d 508, 511 (La. App. 1st Cir. 1982). Procedural rights peculiar to one case are not rendered applicable to a companion case by the mere fact of consolidation; each case must stand on its own merits. *Howard*, 417 So.2d at 511. The consolidation of two cases did not in any way enlarge or decrease the rights of the litigants. *Johnson v. Shafor*, 22 So.3d 935, 941 (La. App. 1st Cir. 2009). Procedural or substantive rights peculiar to one case are not rendered applicable to the companion suit by the mere fact of consolidation. *Williams v. Scheinuk*, 358 So.2d 340, 341 (La. App. 4th Cir. 1978).

14

In our home courts, an order of consolidation effectively discontinues the separate actions and creates a single new and distinct action. *Jeffery v. Weintraub*, 32 Wn. App. 536, 547, 648 P.2d 914 (1982). This principle does not, however, suggest that new parties to the second suit are bound by rulings earlier made in the first suit.

Our observation that the lost chance theory has not been dismissed in the 2012 suit may only be a momentary victory for the beneficiaries of Betty Zachow's estate. Upon remand, SHMC will have the opportunity to file a motion to dismiss the lost chance theory in the second suit, based upon our ruling affirming the dismissal of the theory in the 2010 suit.

ISSUE 4: Did the trial court err when it struck, on the merits, Robin Rash's loss of chance theory in the 2010 lawsuit?

ANSWER 4: No.

After an extended detour, we arrive at the epicenter of the appeal. We ask whether the trial court, under the facts read in a glow favorable to Robin Rash and based upon the testimony of Dr. Wayne Rogers, properly dismissed the 2010 suit's lost chance theory as a matter of law.

The trial court struck Rash's claim because she failed to present evidence establishing SHMC's negligence was a "but for" cause of Betty Zachow's loss of chance. Rash argues a plaintiff need only show defendant's negligence was a substantial factor, but does not distinguish between a substantial factor in causing harm and a substantial

15

factor in causing a lost chance. According to Rash, Dr. Wayne Rogers' testimony that SHMC's negligence "significantly" accelerated her weakening heart satisfies the laxer proximate cause standard of negligence being a substantial factor in the harm.

Because of the esoteric nature of the contentions and the law on point, we find it helpful to pose discrete questions to assist in answering the overall issue of whether Robin Rash's version of the facts survive a summary judgment motion on the element of causation. First, may a plaintiff recover by establishing the negligence of the health care provider was a substantial factor, rather than the "but for" cause, under a lost chance analysis? Second, may a plaintiff recover in a medical malpractice suit for a reduced life expectancy? Third, may a plaintiff recover by establishing the negligence of the health care provider was a substantial factor, rather than the "but for" cause, under a reduced life expectancy analysis? Fourth, must a plaintiff have expert testimony of the length of the reduced life expectancy in order to sustain a claim for decreased life expectancy? Fifth and conversely, may a plaintiff recover under a decreased life expectancy analysis by the use of statistical averages, such as average life expectancy tables? We address these questions in such order, but conflate the last two questions.

Since the court dismissed the lost chance claim as a matter of law after reviewing affidavits, we consider the ruling to be a partial summary judgment order. Under summary judgment, the court considers the facts and inferences from the facts in a light most favorable to the nonmoving party. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300,

16

45 P.3d 1068 (2002). A court may grant summary judgment if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Jones*, 146 Wn.2d at 300-01. In forwarding its motion to dismiss, SHMC assumed those facts most favorable to Robin Rash, including the opinions rendered by Rash's expert, Dr. Wayne Rogers.

### Causation in Lost Chance Analysis

A lost chance claim is not a distinct cause of action but an analysis within, a theory contained by, or a form of a medical malpractice cause of action. *Dormaier*, 177 Wn. App. at 854-57. Thus, throughout this opinion, we do not refer to lost chance as a cause of action, but a doctrine, theory, claim, or analysis, unless we cite pleadings of the parties that use the term "cause of action." A plaintiff's pleading of a medical malpractice or health care provider negligence cause of action is sufficient to raise a lost chance claim. *Dormaier*, 177 Wn. App. at 857.

The trial court erred when dismissing the lost chance claim in the 2010 lawsuit on the ground that the theory was not pled by Betty Zachow. We still affirm the trial court's dismissal since the trial court correctly dismissed the theory on its merits. We can affirm the trial court on any grounds established by the pleadings and supported by the record. *Gross v. City of Lynnwood*, 90 Wn.2d 395, 401, 583 P.2d 1197 (1978); *E. Wind Express, Inc. v. Airborne Freight Corp.*, 95 Wn. App. 98, 102, 974 P.2d 369 (1999).

Lost chance claims can be divided into two categories: lost chance of survival and

17

lost chance of a better outcome. *Herskovits v. Grp. Health Coop. of Puget Sound*, 99 Wn.2d 609, 664 P.2d 474 (1983); *Mohr*, 172 Wn.2d 844, 262 P.3d 490 (2011). In a lost chance of survival claim, the patient died from a preexisting condition and would likely have died from the condition, even without the negligence of the health care provider. Nevertheless, the negligence reduced the patient's chances of surviving the condition. *Herskovits*, 99 Wn.2d 609. The quintessential example of a lost chance of survival claim is a preexisting cancer that a physician untimely diagnosed. We distinguish between a lost chance of survival theory and a traditional medical malpractice theory. In the latter, but for the negligence of the health care provider, the patient would likely have survived the preexisting condition. In other words, the patient had a more than 50 percent chance of survival if the condition had been timely detected and properly treated. In a lost chance claim, the patient would likely have died anyway even upon prompt detection and treatment of the disease, but the chance of survival was reduced by a percentage of 50 percent or below.

In a lost chance of a better outcome claim, the mortality of the patient is not at issue, but the chance of a better outcome or recovery was reduced by professional negligence. *Mohr*, 172 Wn.2d at 857. In a traditional medical malpractice case, the negligence likely led to a worse than expected outcome. Under a lost chance of a better outcome theory, the bad result was likely even without the health care provider's negligence. But the malpractice reduced the chances of a better outcome by a percentage

18

of 50 percent or below.

Robin Rash points to the 50 percent or less causation standard in lost chance claims to argue that Washington has adopted a substantial factor test and removed the "but for" causation standard in a health care provider malpractice cause of action, or at least when the cause of action is based upon a lost chance theory. We do not read Washington decisions in this light. To address Rash's contention, we review a handful of Washington decisions on lost chance.

*Herskovits,* is the first Washington case to address a theory of lost chance in a medical malpractice suit. In *Herskovits,* the widow of Leslie Herskovits sued physician William Spencer, an employee of Group Health, for medical malpractice. The state high court assumed that Spencer negligently and untimely failed to diagnose Leslie Herskovits' lung cancer. If Spencer had timely diagnosed the cancer, Herskovits' chance of survival would have been 39 percent. Because of the late diagnosis, Herskovits' chance of survival was 25 percent. Thus, Spencer's negligence reduced Herskovits' chance of survival by 14 percent. Under traditional negligence jurisprudence, Herskovits' surviving wife would lose, because she could not prove that the alleged negligence of Dr. Spencer caused any damage, since Herskovits would have likely died anyway. The court addressed the question: "whether an estate can maintain an action for professional negligence as a result of failure to timely diagnose lung cancer, where the estate can show probable reduction in statistical chance for survival but cannot show

19

and/or prove that with timely diagnosis and treatment, decedent probably would have lived to normal life expectancy [?]" *Herskovits*, 99 Wn.2d at 610.

A split state Supreme Court allowed Edith Herskovits to maintain her action. Justice Dore joined by one other justice wrote the lead opinion. Justice Dore relied upon *Restatement (Second) of Torts* § 323(a) (1965), which reads, in part, "'One who undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm.'" Justice Dore did not wish to provide a "blanket release from liability for doctors and hospitals any time there was less than a 50 percent chance of survival, regardless of how flagrant the negligence." *Herskovits*, 99 Wn.2d at 614. Section 323(a) constituted "authority to relax the degree of certitude normally required of plaintiff's evidence in order to make a case for the jury." *Herskovits*, 99 Wn.2d at 615. Justice Dore held that "medical testimony of a reduction of chance of survival from 39 percent to 25 percent is sufficient evidence to allow the proximate cause issue to go to the jury." *Herskovits*, 99 Wn.2d at 619.

Justice Pearson wrote a concurring opinion joined by three other justices. This plurality opinion spoke briefly of modifying the standard of proof for causation but emphasized redefining the injury:

Therein lies the crux of this case, for it is possible to define the injury or "disability" to Mr. Herskovits in at least two different ways. First, and most obviously, the injury to Mr. Herskovits might be viewed as his death. Alternatively, however, the injury or disability may be seen as the reduction of Mr. Herskovits' chance of surviving the cancer from which he suffered.

Therefore, although the issue before us is primarily one of causation, resolution of that issue requires us to identify the nature of the injury to the decedent. Our conception of the injury will substantially affect our analysis. If the injury is determined to be the death of Mr. Herskovits, then under the established principles of proximate cause plaintiff has failed to make a prima facie case.

If, on the other hand, we view the injury to be the reduction of Mr. Herskovits' chance of survival, our analysis might well be different. Dr. Ostrow [Herskovits' expert] testified that the failure to diagnose cancer in December 1974 probably caused a substantial reduction in Mr. Herskovits' chance of survival.

*Herskovits*, 99 Wn.2d at 623-24. Justice Pearson chose to "view the reduction in or loss of the chance of survival, rather than the death itself, as the injury." *Herskovits*, 99 Wn.2d at 632 (Pearson, J., concurring). He held that "plaintiff has established a prima facie issue of proximate cause by producing testimony that defendant *probably* caused a substantial reduction in Mr. Herskovits' chance of survival." *Herskovits*, 99 Wn.2d at 634 (emphasis added).

In *Shellenbarger v. Brigman*, 101 Wn. App. 339, 3 P.3d 211 (2000), the court viewed the *Herskovits* plurality opinion as redefining the "harm" as a reduction in the chance of survival. In *Daugert v. Pappas*, 104 Wn.2d 254, 704 P.2d 600 (1985), the Supreme Court declined to extend the lost chance doctrine to a legal malpractice claim. The court considered *Herskovits* to either modify the traditional "but for" causation test,

redefine an injury to include a lost chance, or both. In *Sorenson v. Raymark Indus., Inc.*, 51 Wn. App. 954, 756 P.2d 740 (1988), the court declined to apply *Herskovits* in the context of an asbestos product liability suit. The court remarked that a second holding in *Herskovits* is that reduction in a patient's opportunity to recover from the illness is a real, distinct, and compensable injury. *Sorenson*, 51 Wn. App. at 957.

Twenty-eight years after *Herskovits*, our Supreme Court again addressed the notion of a lost chance, in a medical malpractice suit, in *Mohr*, 172 Wn.2d 844. Linda Mohr and her husband claimed that the alleged medical negligence decreased the extent of her recovery from a stroke. As a result of the stroke, Mohr suffered permanent brain damage. Plaintiffs' experts testified that had Mohr received nonnegligent treatment, she would have had a 50 to 60 percent[1] chance of a better outcome.

In *Mohr*, the Supreme Court framed the issue as, "In the medical malpractice context, is there a cause of action for a lost chance of a better outcome?" *Mohr*, 172 Wn.2d at 850. The *Mohr* court addressed the question in the context of whether Mohr must prove "but for" causation or only that the negligence was a substantial factor in

---

[1] One wonders if *Mohr* should be treated as a lost chance case, since under traditional proximate cause principles, Mohr needed to only establish by a 51 percent chance that the alleged negligence caused her increased disability. Perhaps the case was considered one involving a lost chance because the range of percentages dipped below 51 percent by one percent. The trial court granted Grantham summary judgment dismissing the suit because Mohr could not show "but for" causation.

22

harm. The Supreme Court ruled that Linda Mohr could proceed to recover for a loss of a chance of a better outcome if she proved negligence. The *Mohr* court concluded:

> We hold that there is a *cause of action* in the medical malpractice context for the loss of a chance of a better outcome. A plaintiff making such a *claim* must prove duty, breach, and that there was *an injury in the form of a loss of a chance* caused by the breach of duty. *To prove causation*, a plaintiff would then rely on established tort *causation doctrines* permitted by law and the specific evidence of the case. Because the Mohrs made a prima facie case of the requisite elements of proof, we reverse the order of summary judgment and remand to the trial court for further proceedings.

*Mohr*, 172 Wn.2d at 862 (emphasis added). The *Mohr* court rejected Justice Dore's approach of relaxing the causation standard and formally adopted the *Herskovits* plurality's rationale of redefining the injury as "the lost chance." *Mohr*, 172 Wn.2d at 859.

The *Mohr* court's adoption of Justice Pearson's decision in *Herskovits* is consistent with rules of analyzing splintered opinions. When no rationale for a decision of an appellate court receives a clear majority, the holding of the court is the position taken by those concurring on the narrowest grounds. *Southcenter Joint Venture v. Nat'l Democratic Policy Comm.*, 113 Wn.2d 413, 427-28, 780 P.2d 1282 (1989); *Zueger v. Pub. Hosp. Dist. No. 2 of Snohomish County*, 57 Wn. App. 584, 591, 789 P.2d 326 (1990). Following this principle, the *Herskovits* plurality represents the law on a loss of the chance of survival. *Zueger*, 57 Wn. App. at 591. The plurality opinion in *Herskovits* requires a plaintiff to present evidence that a defendant's negligence was the "but for

cause" of the plaintiff's loss of chance. *Herskovits*, 99 Wn.2d at 634-35. Rash is therefore incorrect. She must establish SHMC's negligence was the "but for cause" of Zachow's loss of chance.

Robin Rash relies, in part, on *Sharbono v. Universal Underwriters Insurance. Company*, 139 Wn. App. 383, 161 P.3d 406 (2007), wherein this court characterized *Herskovits* as employing the "substantial factor test" for determining proximate cause in medical malpractice cases where the malpractice reduces a decedent's chance of survival. *Mohr v. Grantham*, 172 Wn.2d 844, declares we were wrong. *Sharbono* was not even a decision involving medical malpractice, but rather a case involving insurance coverage and bad faith.

Washington decisions were decided with the backdrop of Washington's 1976 health care act that covers actions for injuries resulting from health care. *See* ch. 7.70 RCW. Under RCW 7.70.030: "Unless otherwise provided in this chapter, the plaintiff shall have the burden of proving *each fact essential* to an award by a *preponderance of the evidence.*" (Emphasis added). One essential element is that the health care provider's "failure was a *proximate cause of the injury complained of.*" RCW 7.70.040 (emphasis added). Nothing in the statute suggests that a substantial factor standard of causation should be employed in a medical malpractice suit.

Based upon *Herskovits* and *Mohr*, Robin Rash need not forward medical testimony that negligence of SHMC was the likely cause of Betty Zachow's death or of a

24

bad outcome. But, Rash must provide a physician's opinion that SHMC "likely" caused a lost chance of survival or a lost chance of a better outcome. Dr. Wayne Rogers' testimony that the hospital error was a substantial factor in accelerating death does not satisfy this requirement. This lack of testimony is pivotal in Robin Rash's suit.

Wayne Rogers also provided no testimony as to any percentage of a lost chance. Every Washington decision that permits recovery for a lost chance contains testimony from an expert health care provider that includes an opinion as to the percentage or range of percentage reduction in the chance of survival. *Herskovits*, 99 Wn.2d at 611 (14 percent reduction in chance of survival); *Mohr*, 172 Wn.2d at 849 (50 to 60 percent chance of better outcome); *Shellenbarger*, 101 Wn. App. at 348 (20 percent chance that the disease's progress would have been slowed). Without that percentage, the court would not be able to determine the amount of damages to award the plaintiff, since the award is based upon the percentage of loss. *See Smith v. Dep't of Health & Hosps.*, 676 So.2d 543, 546-47 (La. 1996). Discounting damages by that percentage responds to a concern of awarding damages when the negligence was not the proximate cause or likely cause of the death. *Mohr*, 172 Wn.2d at 858; *Matsuyama v. Birnbaum*, 452 Mass. 1, 17, 890 N.E.2d 819 (2008). Otherwise, the defendant would be held responsible for harm beyond that which it caused. The leading author on the subject of lost chance declares:

> Despite the sound conceptual underpinnings of the doctrine, its successful application depends on the quality of the appraisal of the decreased likelihood of a more favorable outcome by the defendant's tortious conduct.

25

Joseph H. King, Jr., *"Reduction of Likelihood" Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine*, 28 U. MEM. L. REV. 491, 546-47 (1998). This quote promotes accurate calculations and use of percentages.

Decreased Life Expectancy

Because of the unique facts of the appeal, we do not end our analysis with a review of the causation standards in a lost chance claim. We explore other arguments and other possible related theories to answer whether Robin Rash's claim can survive a summary judgment motion. We note, however, that inevitably the outcome of the case returns to the same causation rules found in a lost chance claim.

In Betty Zachow's complaint she asked for damages for a reduced life expectancy. Although she conflates her analysis of a reduced life expectancy theory with the lost chance doctrine, Rash may argue that a reduced life expectancy theory is different in nature than a lost chance theory and that different causation standards should apply to the former theory. We explore whether a reduced life expectancy theory exists and whether its causation rules are laxer.

We believe that characterizing Robin Rash's claim as one for the decreased life expectancy presents a clearer picture of her claim than identifying the claim as one for a lost chance. We brand a potential claim for reduced life expectancy to be one in which the patient had no chance of surviving the preexisting condition, but the health care provider's negligence accelerated the death. In other words, the preexisting condition

would have precluded a normal life span, but the malpractice further shortened the life span.

One Washington Court of Appeals decision discusses a claim for reduced life expectancy in the context of a medical malpractice cause of action. In *Shellenbarger v. Brigman*, 101 Wn. App. 339, two of Gerald Shellenbarger's physicians failed to diagnose and treat his lung disease in its early stages. Shellenbarger had been exposed to asbestos during work. Shellenbarger's medical expert witness agreed that Shellenbarger would have died early regardless of timely treatment. The expert testified, however, that, if the physicians had diagnosed and treated the disease earlier, Shellenbarger would have had a 20 percent chance that the disease's progress would have been slowed. The trial court granted the physicians' summary judgment on the question of proximate cause. We reversed.

In *Shellenbarger v. Brigman*, we noted that Gerald Shellenbarger did not argue that he had a lost chance of survival. Instead, he contended he had a lost chance of slowing the disease. We reasoned that Shellenbarger's claim was in essence the same as a lost chance of survival. We noted that, if Leslie Herskovits, in Washington's seminal decision, had been cured of lung cancer, he could have expected additional years of life. Similarly, Shellenbarger claimed he should have expected additional years of life.

Causation in Reduced Life Expectancy Analysis

*Shellenbarger v. Brigman* teaches that the same analysis applied to a claim based

upon a lost chance of survival should be applied to a claim based upon a reduced life expectancy. Presumably, the same causation analysis applies to both claims. Under *Herskovits* and *Mohr*, we redefine the injury as a "chance" for longer life, not life itself or a full life. Thus, under any reduced life expectancy theory, a plaintiff must still prove the negligence "likely" reduced the "chance" of a longer life. Shellenbarger's expert impliedly testified that the untimely diagnosis likely reduced the chance of a longer life and that chance was 20 percent. Shellenbarger could then recover 20 percent of the damages incurred because of a shorter life.

We question the analysis in *Shellenbarger v. Brigman*. The analysis creates a complicated quest to determine if the patient has likely been injured. A physician must first determine if the malpractice likely reduced the "chance" of a longer life and, thereafter, opine what is the percentage that the chance was reduced. The length in the reduced life span is apparently irrelevant. We believe that a better analysis would be to require the patient's expert to testify that the malpractice likely reduced the life span and then give an opinion as to the length of any life reduction, such that the jury may impose damages based upon that quantified reduction. The plaintiff may then receive the full award for the reduced life expectancy, not just a percentage of the award. A leading commentator advocates compensation for the full value of the months by which the decedent's life was probably shortened. Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future*

28

*Consequences*, 90 YALE L.J. 1353, 1382-83 (1981). In short, the *Herskovits* analysis becomes problematic for a jury, if not a judge, in a bench trial. Applying the *Herskovits* analysis fits better with a lost chance of survival claim, since the lost chance is of a full life not some already known or unknown shortened life span.

We question the ability of a medical expert to retroactively predict the life expectancy of a patient with a preexisting condition before interference by medical malpractice. But any difficulty can be addressed another day. Determining the lost chance of survival by a percentage may be as difficult.

Dr. Wayne Rogers does not expressly testify that the failure to provide the two doses of beta blockers "likely" reduced Betty Zachow's "chances" of a longer life. Stretching the facts to the end of the light spectrum in favor of Robin Rash might lead us to conclude that Rogers impliedly so testified. Nevertheless, even under a *Shellenbarger* analysis, Rash's suit cannot survive a summary judgment motion. Assuming Wayne Rogers testified that SHMC's conduct likely reduced Zachow's life expectancy, he does not testify as to the percentage of that likely loss.

*Shellenbarger v. Brigman* followed standard principles of proximate cause. The court wrote:

> In a medical negligence case, summary judgment is not appropriate if "a reasonable person could infer, from the facts, circumstances, and medical testimony that a causal connection exists." But the evidence must "rise above speculation, conjecture, or mere possibility." "[M]edical testimony must demonstrate that the alleged negligence 'more likely than not' caused the later harmful condition leading to injury; that the defendant's actions

29

'might have,' 'could have,' or 'possibly did' cause the subsequent condition is insufficient."

101 Wn. App. at 348 (internal citations omitted).

Use of Life Expectancy Tables

We analyze now the heart of Robin Rash's theories of liability, causation, and damages. Robin Rash claims she can survive a summary judgment motion by comparing the life expectancy of a woman at Betty Zachow's age at the time of the negligence with the length of time Zachow lived after the negligence. Rash notes that, at the time of the knee surgery, the mortality table showed Betty Zachow's life expectancy was 7.56 years. She died two years later. Rash asks that the jury be able to determine damages based upon a shortened life of five and one-half years, since her expert witness testified that SHMC's conduct was a substantial factor in an accelerated death.

We refuse to adopt Robin Rash's theory of causation and damages and decline the adoption of a reduction in life expectancy theory with different causation rules, for two reasons. First, the adoption should come from the Washington Supreme Court. Second, differing causation rules should be adopted only if there is medical evidence as to the length of the reduction in life expectancy. We hold that a trial court should not allow use of life expectancy tables for a reduced life expectancy theory. We further hold that medical testimony as to the likely decrease in a patient's life span is required in a reduced life expectancy claim.

Using the average life expectancy for a woman the age of Betty Zachow is not

fair, because her preexisting conditions would likely have led to a premature death without the negligence of SHMC. Although Dr. Rogers testified to an accelerated death, he never established a life expectancy for Zachow, before the professional negligence, nor testified to a reduction in years or months of Betty Zachow's life because of the malpractice. We know when Zachow's life ended, but we do not know the date of the likely ending without the negligence of SHMC.

Washington has not addressed whether the insurance commissioner's life expectancy tables may be used to measure damages for one suffering from a preexisting condition that would otherwise shorten the decedent's life expectancy. Other courts have either discouraged or rejected use of life expectancy tables under such circumstances.

The use of life expectancy tables is disfavored where the plaintiff has a preexisting condition or disease that adversely affects his or her projected life span, since the tables are based on the lives of healthy persons. *McWilliams v. Exxon Mobil Corp.*, 12-1288 (La. App. 3d Cir. 4/3/13); 111 So.3d 564, 574. Missouri case law is well settled that "the probative value of the mortality tables may be weakened, and even, perhaps, in some cases, destroyed by evidence of ill-health or disease of the person whose life expectancy is in issue." *Sampson v. Missouri Pac. R.R., Co.*, 560 S.W.2d 573, 585 (Mo. banc 1978) (quoting *Dorsey v. Muilenburg*, 345 S.W.2d 134, 142 (Mo. 1961); *Moore v. Ready Mixed Concrete Co.*, 329 S.W.2d 14, 28 (Mo. banc 1959). In ascertaining a plaintiff's life expectancy, the jury may take into consideration evidence as to his health, constitution,

31

and habits. *Caudle v. Southern Ry. Co.*, 242 N.C. 466, 88 S.E.2d 138 (N.C. 1955). The mortality tables are not conclusive evidence of the life expectancy of a particular person, but are accepted only as an aid to the jury in connection with other relevant facts in arriving at the probable duration of the life of a person, such that it is error to charge that a particular person of a given age has a life expectancy of a certain number of years. *Louisville & Nashville R.R. Co. v. Richardson*, 285 Ala. 281, 231 So.2d 316, 317 (1970).

In an ancient Michigan decision, *Norris v. Detroit United Ry.*, 193 Mich. 578, 160 N.W. 574 (1916), the parties agreed that the plaintiff was not an ordinarily healthy person at the time of her injury. Therefore, the court held it was prejudicial error to admit as evidence the mortality tables. Based upon the *Norris* decision, a federal court ruled, in a more recent decision, that Michigan law disfavors use of mortality tables when the plaintiff has a preexisting condition or disease that adversely affects his projected lifespan, since the tables are based on the lives of healthy persons. *Draisma v. United States*, 492 F. Supp. 1317, 1329 (D.C. Mich. 1980).

In *Muller v. Lykes Brothers. Steamship. Company*, 337 F. Supp. 700 (E.D. La.), *aff'd*, 468 F.2d 951 (5th Cir. 1972), plaintiff submitted to the Court the 1960 United States Department of Labor mortality tables that indicated that a normal person of plaintiff's age would have a life expectancy of 27.7 years and a work-life expectancy of 20.6 years. In an unflattering ruling, the court held the tables to lack any relevancy. Plaintiff suffered from the condition of constitutional obesity. His blood pressure was

No. 31277-1-III
*Rash v. Providence Health & Servs.*

recorded at 260/140 and noted as "grossly abnormal." Plaintiff smoked and drank beer and other alcohol excessively. In consideration of plaintiff's physical condition and the general state of his health, apart from the injury that gave rise to the suit, the court held the tables inapplicable to a determination of plaintiff's life expectancy or work-life expectancy.

## CONCLUSION

We affirm the dismissal of the claims for lost chance and reduced life expectancy forwarded in Spokane County Superior Court Cause No. 10-2-00084-9. We remand the consolidated case to the superior court for further proceedings consistent with our decision.

Fearing, J.

WE CONCUR:

Brown, A.C.J. I concur solely in the result.

Korsmo, J.